G. Harold Earle and Anne Earle v. Commissioner. Stewart E. Earle and Elsie Earle v. Commissioner.
G. Earle v. Commissioner
Docket Nos. 2328, 2329.
United States Tax Court
1945 Tax Ct. Memo LEXIS 93; 4 T.C.M. (CCH) 859; T.C.M. (RIA) 45281; August 28, 1945
George E. H. Goodner, Esq., Munsey Bldg., Washington, D.C., for the petitioners Ned Fischer, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: These proceedings, consolidated for hearing and disposition, involve redeterminations of deficiencies in income taxes for the taxable year 1940, as follows: Docket No.
Deficiency
2328
$4,337.40
2329
4,772.84
The only questions in issue are whether certain losses suffered by the petitioners in connection with their stockholdings in the Fargo Western Oil Company and in Grants Pass Timber Company were sustained by them in 1940. Findings of Fact The petitioners in each case are husband and wife, residing at Hermansville, Michigan. Petitioners G. Harold Earle and Stewart E. Earle, brothers, will hereinafter *94 be referred to as petitioners. Each couple filed a joint income tax return for the taxable year with the collector for the district of Michigan. The returns were filed on a cash receipts basis. Issue No. 1 - Fargo Western Oil Company In 1929 each petitioner purchased 900 shares of stock in the Fargo Western Oil Company, hereinafter called Fargo, at a cost of $900. Each petitioner also held certain first mortgage bonds of said company. The Casper National Bank of Casper, Wyoming, was trustee under the mortgage of the Fargo Company, securing its first mortgage bonds. Neither of the petitioners herein were officers or directors of the Fargo Company. On or about December 14, 1938, the Fargo Company issued a statement reflecting its assets and liabilities as of November 30, 1938. This statement listed assets of $1,778,691.79, which included current assets of about $17,000; capital assets, made up of land and leases, wells construction and equipment, minus reserves for depletion and depreciation of approximately $1,760,000, and deferred charges of $1,095. Its liabilities were listed as accounts payable, $23,432; contract payable, $7,173; unmatured funded debt, $250,000; interest on *95 mortgage bonds, $7,709; and total outstanding stock $870,064, leaving a surplus after adjustments of approximately $620,000. A statement of operations for the 11-month period ended November 30, 1938, reflected a net operating loss for the period of $6,496.66. Accompanying the balance sheet was a letter from the president of Fargo to the stockholders, pointing out that that year had been the second worst in the history of the company. The company had abundant oil resources, but marketing conditions were so bad that the wells were closed down on July 9, 1938. At that time the company had some 66,000 barrels of oil held in storage which could not then be disposed of at any price. The letter pointed out that the bond issue would fall due on July 1, 1939, and that the president had been authorized to begin negotiations for some plan to refinance them. The letter concluded with the hope that the company would be successful in its effort, and that the next year would be a more profitable one. In June 1939 Fargo was without ready funds to pay past due taxes, insurance and other charges essential to the preservation and protection of the property, and interest on the first mortgage bonds *96 due January 1, 1939, was unpaid. In order to preserve the assets the Casper National Bank, as trustee, was asked to take possession of the property, which it did on June 12, 1939. It was indicated that the trustee intended to take an aggressive policy to encourage the sale of oil and that it would preserve and protect the property as economically as possible. The trustee was authorized to make advances for expenses incidental to the preservation and protection of the property, and the amount of advances by the trustee to November 8, 1939, amounted to $4,154.20, upon which it was entitled to interest at the rate of seven percent per annum. The trustee kept expenses at a minimum, using only three employees, two field men, and an office clerk. The largest item of expense was taxes. The trustee did not pay the semi-annual bond interest due January 1, 1939, nor were the principal and interest due July 1, 1939, paid. On January 3, 1940, the trustee reported that there had been no new developments since the November 8th report and that after careful consideration of the bondholders' interests, the trustee was of the opinion that no real good could be accomplished by the trustee's continuing *97 to manage the property, and that the trust indenture should be foreclosed. In accordance with the terms of the trust deed, notice of sale was published for four consecutive weeks beginning with the issue of December 29, 1939. The sale was advertised to take place on January 27, 1940, at the courthouse in Casper, Wyoming. The notice to the bondholders called attention to the fact that they were entitled to buy in the property at the sale and to apply any bonds and matured and unpaid coupons held by them upon the purchase price. The sale was to be at public auction. A committee of the bondholders organized a new corporation known as the Investors Oil Company. Its purpose was to acquire the properties of Fargo if they were bid in by the committee at the sale. Bondholders desiring to participate delivered their bonds along with a percentage of cash to the committee. Petitioners participated in the plan. The committee, representing holders of $175,000 of the bonds, purchased Fargo's assets for $50,000 at a sale on January 27, 1940. The bondholders delivering their bonds to the committee received common stock in the Investors Oil Company for the bonds delivered and received preferred stock *98 for the cash they advanced. Those holders who did not participate were paid a small percentage of the face value of their bonds in cash. The Investors Oil Company was at the time of the hearing a going concern, and petitioners were owners of the stock they had received for their bonds and the cash they had paid in. At the time of the sheriff's sale the bonds issued and outstanding in the amount of $250,500 were past due. Interest thereon at the rate of seven percent was in default from January 1, 1939. Other charges and encumbrances on the property to the date of the sale amounted to about $13,627. The stockholders of Fargo never received anything for or on account of their stockholdings. The stock became worthless in 1940. In their income tax returns for the year 1940 petitioners deducted 50 percent of their cost as a long-term capital loss on an asset held for more than 24 months. The Commissioner disallowed the deduction on the ground that the loss had been sustained in 1939. Opinion The sole question is whether the petitioners' stock in the Fargo Company became worthless in 1940, so as to entitle them to take their loss in that year, or whether the stock became worthless *99 prior to 1940, as determined by the Commissioner. There is no controversy as to the amount of the loss sustained. The statement of assets and liabilities of Fargo as of November 30, 1938, which is unchallenged, indicates that the stock was far from being worthless at that time. The record is not as explicit as might be desired as to what expenses were incurred between November 30, 1938, and the date of the sale. During that time the wells were not in operation and it is evident that the expenses were not great. Bond interest due January 1, 1939, taxes, insurance and some other charges incidental to the management of the property were unpaid on June 12, 1939, when the trustee took over. Advances made by the trustee up to November 8, 1939, amounted to some $4,000. Other than the bonds and interest charges, encumbrances against the property, including the trustee's advances, amounted to only some $13,000 at the date of the sale in 1940. Thus, it seems clear that the assets back of the stock were not exhausted between November 30, 1938, and the close of 1939, and that the stock had value on January 1, 1940. We think it is established that stock will not be held to be worthless for *100 Federal tax purposes so long as the assets of the corporation exceed its liabilities other than the capital stock. Even when the liabilities exceed the assets, if there is a prospect of improved conditions, which might bring about a reverse, the stock may not be held to be worthless. That the shares may be worthless on a liquidation is not decisive of the question. See ; aff'd. . Actual worthlessness is the test and we think the evidence here clearly establishes value in 1940. Moreover, the greater part of the assets of Fargo consisted almost entirely of oil-producing properties, wells and operating equipment, and were not of the type readily marketable. There were ample oil reserves and there was oil in storage, but the difficulty was in finding an outlet for the oil produced. In the light of the economic circumstances of the times, we believe that the petitioners would have been entirely justified in a belief that potentially the stock had a very substantial value. This is somewhat borne out by the fact that the properties were thereafter *101 operated successfully by the new company. The identifiable event establishing that the petitioners suffered a loss and which made it possible to ascertain the amount thereof with certainty was the sale of Fargo's assets at the auction held on January 27, 1940. We have encountered no evidence whatsoever that the sale and events leading up to it were not bona fide in every respect. While the property was sold for $50,000 to a committee of the bondholders (who, we think, could reasonably have been expected to take action of that nature in protection of their interests), the fact remains that only at that time was it definite that the stockholders would realize nothing on their stock. It was quite possible that the property might have brought more than the $300,000 necessary to take care of the company's obligations, in which event there would have been funds available for distribution to the stockholders. For the petitioners on this issue. Issue No. 2 - Grants Pass Timber Co. [The Facts] At their father's death in 1923, each of the petitioners acquired 128 1/3 shares of stock in the Grants Pass Timber Company, hereinafter called the Timber Company, an Oregon corporation. The *102 cost basis to each petitioner was $33,752.11. The Timber Company was a holding company with assets consisting primarily of timber lands. Neither of the petitioners was ever an officer or director of the Timber Company. Their stockholdings amounted to about 30 percent of the company's outstanding stock. In 1930 and subsequent thereto, the Timber Company was without funds to pay its taxes and similar expenses. Thereafter, on several occasions it assessed its shareholders in order to raise the necessary funds. By the close of 1939 petitioners had advanced amounts totaling $5,205.50 ($5,205.56 in the case of Stewart E. Earle) to the Timber Company, which amount they treated as an additional cost of the stock in their income tax returns. In his deficiency computation the Commissioner likewise treated the amounts as an addition to petitioners' cost. For some years prior to 1939 the Timber Company was inactive. On December 12, 1939, at a meeting of the stockholders duly called for that purpose, it was resolved that the corporation be dissolved as of that date, and that its assets, after payment of all its indebtedness, be distributed to the stockholders in proportion to their respective *103 stockholdings. On the same date the directors passed a similar resolution and directed the officers to file copies of the resolutions with the Corporation Commissioner for the State of Oregon. This was done December 16, 1939, and on that same date the Corporation Commissioner issued a certificate of dissolution. The Timber Company disposed of the last of its non-cash assets in 1939. The last parcel of land was sold under date of December 30, 1939, and the purchase price was collected in 1940. An account receivable amounting to $600 was collected on January 22, 1940. Payments for tax advice, abstracts, selling commissions, and excise tax were made in 1940. On advice of counsel the officers of the corporation withheld distribution of part of the assets of the corporation pending the outcome of negotiations with the Commissioner of Internal Revenue concerning the corporation's tax liability in connection with certain sales made by it in 1939. It was not definitely known whether the Timber Company would be liable to taxes on the sales in question until September 1940. Under date of January 10, 1940, each petitioner received a payment of $1,371.88 and under date of September 11, 1940, each *104 received a final payment of $75.07. At the time these payments were made payments were also made to all other stockholders in proportion to the number of shares held by them. The Timber Company treated the payments as liquidating dividends. In their tax returns petitioners deducted the above payments totaling $1,446.95 from the sum of $38,957.67 which represented the original cost of the stock, plus the advances. They reported 50 percent of the balance as a long-term capital loss on an asset held for more than 24 months. The respondent disallowed the deduction on the ground that the loss was suffered in 1939. As a result of the adjustments made by the Commissioner each petitioner had an overpayment for the taxable year 1939.
Opinion In brief, the respondent has conducted his case on the theory that the advances made by the petitioners to the Timber Company were loans and that the payments received by the petitioners in 1940 were payments upon the corporation's indebtedness to them and were not liquidating dividends. Since the corporation's assets were insufficient to pay in full the amount of such debts, it is claimed that the stock had no value on January 1, 1940, with the consequence *105 that the petitioners were not entitled to a loss deduction in that year. We are unable to approve the argument. In reporting their income tax liability for 1940, the petitioners referred to the advances as "loans," but the return clearly reveals that the petitioners were claiming the advances as an additional cost of their stock and that they did in fact add them to their cost. The payments received from the corporation, designated on the returns as "complete liquidating dividends," were deducted from such total cost. Fifty percent of the balance was reported as a long-term capital loss on an asset held for more than 24 months. In his deficiency letter, the Commissioner held that "losses sustained on stocks of Fargo Western Oil Company and Grants Pass Timber Company are disallowed as deductions of the taxable year. See explanation of item (b) herein for the year 1939." The explanation of adjustments for the year 1939 is as follows: Long-term capital loss deduction is increased as follows: Losses not claimed in 1939 return
Fargo Western Oil Co.
(50% of $900)
$ 450.00
Grants Pass Timber Co.
(50% of $37,510.72)
18,755.36
The deficiency computation did not take *106 into account any allowance for bad debts, nor did the petitioners claim such deductions in their returns. The amended petitions do not allege error on the part of the Commissioner in his treatment of the advance as an addition to the cost, nor has the Commissioner, by his answer, affirmatively asserted that his deficiency computation was erroneous. Moreover, it appears that the Timber Company did not regard the advances as loans. In the letter accompanying the last check the Timber Company referred to the payment as a final distribution on the stock. Further, it is clear that the payments to the petitioners were made at a time when payments were made to all stockholders in proportion to their stockholdings. We are constrained to take the view that the payments received by petitioners were liquidating dividends and not repayments on indebtedness. When, as here, the transaction giving rise to the loss is the liquidation of a corporation, the transaction is completed and the loss is sustained when provision has been made for the payment of corporate debts, and the remaining assets, if any, are distributed to the stockholders. ; *107 , certiorari denied, . While it appears that the Timber Company wound up most of its affairs in 1939, and that a certificate of dissolution was issued in that year, nevertheless, under express provisions of Oregon law a corporation exists for five years after its dissolution for the purpose of winding up its affairs, including necessary litigation, and the only restriction is that it shall not continue its corporate business. Oregon Compiled Laws, Ann., Vol. 5, § 77-259. See . The Timber Company paid out and collected money in 1940, and upon the advice of an attorney the corporation withheld distributing part of its cash assets to the stockholders pending the outcome of negotiations with the Commissioner of Internal Revenue as to possible tax liability on certain transactions in 1939. There was a partial distribution in January 1940, but approximately $500 in cash was held back for the purpose of discharging tax liability should it be determined that an amount was owing by the corporation. *108 In September 1940, the corporation was advised that no deficiency would ensue and at that time final payments were distributed to the stockholders. The payment measured petitioners' losses and only then were they entitled to take their deductions. It follows that the losses were sustained in 1940. We think there is no importance to be attached to respondent's point that petitioner Stewart Earle had suggested that it would be advantageous to him if the liquidation of the corporation could be completed in 1940. He was not an officer or director in the company, and had no controlling stock interest. Moreover, there is no evidence that his suggestion had any effect whatsoever, or that it delayed the orderly liquidation of the company. Certainly there appears to be no basis for a conclusion that the payments were constructively received by the petitioners in 1939. Decisions will be entered under Rule 50.